UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER M. SANSONE, and BALDEMAR ORDUNO, Jr., Individually and on Behalf of Other Members of the Public Similarly Situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC.; TWC ADMINISTRATION LLC; CHARTER COMMUNICATIONS, LLC; and DOES 1-25, inclusive,<br><br>                              Defendants. | Case No.:  17cv1880-WQH-JLB<br><br>**ORDER** |

HAYES, Judge:

    The following matters are pending before the Court: 1) the Motion to Certify Class (ECF No. 61) filed by Plaintiffs Jennifer M. Sansone and Baldemar Orduno, Jr.; 2) the Motion to File Documents Under Seal (ECF No. 68) filed by Defendants Charter Communications, Inc.,  Charter Communications, LLC, and TWC Administration LLC; 3) the Motion for Summary Judgment (ECF No. 71) filed by Defendants; and 4) the Motion to File Documents Under Seal (ECF No. 72) filed by Defendants.

1

# I.  PROCEDURAL BACKGROUND

On December 6, 2017, Plaintiffs Jennifer M. Sansone and Baldemar Orduno, Jr., individually and on behalf of members of the public similarly situated, filed the first Amended Complaint, the operative complaint in this action against Defendants Charter Communications, Inc. (CCI); Charter Communications, LLC (CCL); and TWC Administration LLC (TWCA).  (ECF No. 19).  Plaintiffs bring claims for: (1) violation of California Labor Code § 227.3 (failure to pay at termination); (2) violation of California Labor Code § 227.3 (valuation); (3) failure to timely pay wages due in violation of California Labor Code §§ 201 and 203; (4) breach of contract (base compensation); (5) breach of contract (commissions); and (6) unfair competition.  *Id.*  Plaintiffs allege that their employment with TWCA was terminated when Time Warner Cable, Inc. (TWCI) and the Legacy Charter Communications, Inc. (L-CCL) merged.[1]  Plaintiffs allege they did not consent to a carryover of the accrued unused vacation wages and that they were not paid for the accrued unused vacation wages.  Plaintiffs allege that CCL calculated vacation wages in a manner that reduced employee compensation.  Plaintiffs allege that CCL reduced employee base compensation after promising not to reduce base compensation.

---

[1] Charter Communications, LLC (CCL) is a subsidiary of Charter Communications, Inc. (CCI).  (Defs.' Resp. to Pls.' Separate Statement of Material Fact ¶ 44, ECF No. 83-3).

The parties reference "Legacy Charter Communications, Inc." and "the former Charter Communications, Inc." interchangeably.  (Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Fact ¶¶ 12, 20, ECF No. 82-2; Defs.' Resp. to Pls.' Separate Statement of Material Fact ¶ 27, ECF No. 83-3).  For purposes of this Order, the Court refers to Legacy Charter Communications, Inc. and the former Charter Communications, Inc. as "L-CCI."

Plaintiffs refer to both Time Warner Cable, Inc. and TWC Administration LLC as "TWC," and collectively refer to Time Warner Cable, Inc and Time Warner Cable Administration, LLC as "Time Warner."  *See* ECF No. 82 at 6; ECF No. 19 at 2.  Defendants refer to Time Warner Cable, Inc. as "TWCI."  *See* ECF No. 83-2 ¶ 3.  For purposes of this Order, the Court refers to Defendant TWC Administration LLC as "TWCA."  The Court refers to Time Warner Cable, Inc. as "TWCI."  TWCI is not a named defendant in this case.

On July 6, 2018, the Court denied a Motion to Dismiss filed by Defendants CCI, CCL, and TWCA. (ECF No. 27).

On February 27, 2019, Plaintiffs filed the Motion to Certify Class supported by a request for judicial notice and declarations. (ECF No. 61). Plaintiffs seek to certify two classes of employees based upon allegations of unpaid accrued vacation wages and reduced base salaries following the merger of TWCI and the former CCI. On April 19, 2019, Defendants filed a Response in Opposition to the Motion to Certify Class supported by declarations (ECF No. 66) and the Motion to File Documents Under Seal (ECF No. 68).

On May 17, 2019, Plaintiffs filed a Reply in Support of the Motion to Certify Class. (ECF No. 70).

On May 31, 2019, Defendants filed the Motion for Summary Judgment. (ECF No. 71). Defendants also filed supporting declarations and a second Motion to File Documents Under Seal. (ECF No. 72).

On May 31, 2019, Defendants filed a Motion requesting that the Court resolve Defendants' Motion for Summary Judgment before considering Plaintiffs' Motion to Certify Class. (ECF No. 74).

On June 4, 2019, Plaintiffs filed a Motion requesting that the Court resolve the Motion to Certify before the Motion for Summary Judgment, vacate the July 1, 2019 hearing date for Defendants' Motion for Summary Judgment, order a briefing schedule for class-wide Cross-Motions for Summary Judgment after the ruling on class certification, and vacate Defendants' Motion for Priority. (ECF No. 76). Plaintiffs alternatively requested that the Court continue the July 1, 2019 hearing date for the Motion for Summary Judgment for 120 days so that Plaintiffs could conduct merits-based discovery to support a Response in Opposition to the Motion for Summary Judgment.

On June 17, 2019, the Court issued an Order denying Plaintiffs' request to consider class certification before summary judgment and denying as moot Defendants' Motion for Priority Consideration. (ECF No. 81). In addition, the Court stated,

The Court defers ruling on Plaintiffs' alternative request to continue the July 1, 2019 summary judgment hearing date for 120 days so that Plaintiffs can conduct merits-based discovery. Plaintiffs may make any arguments regarding inadequate discovery in the response in opposition to the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows . . . it cannot present facts essential to justify its opposition . . . .").

*Id.* at 4.

On June 17, 2019, Plaintiffs filed a Response in Opposition to the Motion for Summary Judgment supported by a request for judicial notice, declarations, and evidentiary objections. (ECF No. 82).

On June 24, 2019, Defendants filed a Reply in Support of the Motion for Summary Judgment supported by declarations and a Response in Opposition to Plaintiffs' Evidentiary Objections. (ECF No. 83).

On June 27, 2019, Defendants filed a Corrected Response in Opposition to Plaintiffs' Objections to Summary Judgment Evidence. (ECF No. 84).

On September 5, 2019, the Court heard oral argument on the Motion for Summary Judgment. (ECF No. 86).

## II. FACTS

Plaintiffs were at-will employees of TWCA and CCL. (Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 11, ECF No. 82-2). On May 26, 2015, Plaintiff Jennifer Sansone and Plaintiff Baldemar Orduno, Jr. were at will employees of Defendant TWCA, a subsidiary of TWCI, not a party in this action. (Sansone Decl. ¶ 2, ECF No. 82-5 at 179; Orduno Decl. ¶ 2, ECF No. 82-5 at 214). Sansone worked as a manager supervising employees including Orduno, who sold TWCI services to California businesses. (Defs.' Resp. to Pls.' Separate Statement of Material Fact ¶¶ 3–4, ECF No. 83-3).

On May 25, 2015, L-CCI and TWCI announced a merger agreement. (Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 12, ECF No. 82-2). The same day, Peter Stern, a Time Warner Cable Executive Vice President, sent the following email:

*To TWC Employees Below Directors Job Level (AIP and SPP eligible)*

Today's announcement of the merger of Time Warner Cable and Charter marks a momentous event in the history of our industry. With the addition of Bright House Networks, this new company will unite industry leaders in innovation, operations and customer service. . . .

This transaction comes after 14 months of preparations to execute a seamless handoff of TWC to Comcast, and for our Midwest operations, to Charter. . . . We've taken some additional steps this time around to ensure you feel confident and trust that we are looking out for your future. . . .

**Your compensation is and will be protected.** In the merger agreement, Charter has committed that for legacy TWC employees who continue in employment following the close, for 12 months, it will (i) not negatively impact current base salaries or annual bonus/AIP target and (ii) maintain other TWC short-term incentives or move them to the same programs as similarly situated Charter employees. Also, through December 31, 2016, the value of your pre-close health and welfare benefits will carry forward. . . .

**Most TWC people who want to work at Charter will get a chance to.** Charter is significantly smaller than Time Warner Cable, and they will need our employees. For most people, the period following the merger close will be very similar to the days before, just with more opportunities for growth, development and impact. But of course that won't be true for everyone. . . .

**It is inevitable that some people will be displaced as part of the merger, but if that happens to you, we will provide great support.** As in any merger like this, there will be some duplication of roles. Looking at other cable mergers and based on our recent experience, this is likely to be a pretty small fraction of our overall workforce. If that happens, however, we and Charter are committed to providing you with top flight outplacement counseling so you can focus on your job knowing that you will receive the advice and support you need.

**If you become eligible for severance, recall, we previously strengthened this benefit.** We previously put in place an enhanced severance program for employees who may be impacted as a result of a merger. Employees who are involuntary terminated without cause or Good Reason termination during the 12 month period following the closing of the merger will receive a minimum of 12 weeks of severance and possibly more (not to exceed 52 weeks) depending on your period of service. . . .

**Our commitment is to tell you all we can, as soon as we can.** Despite all the points above, there's a lot we don't know and won't know for some time. For example, we don't know what will happen with individual jobs at this time. . . .

> *Please note that your receipt of this communication does not mean that you are eligible for all of the benefits discussed in this document. This communication is for informational purposes only and in all instances, the terms and conditions of the applicable plan and agreements govern. Please consult the applicable documents for specific eligibility and participation requirements. . . .*

(Exs. to Morello Decl., ECF No. 82-5 at 11, 171, 190, 225; Ex. 1 to Biggs Decl., ECF No. 66-2 at 6).

On May 18, 2016, the transaction between TWCI and L-CCI closed and resulted in a new entity, Charter Communications, Inc. (CCI). (Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 20, ECF No. 82-2). TWCA became an indirect subsidiary of CCI as a result of the transaction. *Id.* ¶ 21. Plaintiffs continued working for TWCA with the same compensation, job duties, work location, and customer base after the May 18, 2016 transaction until December of 2016. *Id.* ¶¶ 22–26. Plaintiffs continued to receive credit for service time with TWCA for purposes of vacation accrual after the May 18, 2016 transaction. *Id.* ¶ 28. In the months after May 18, 2016, the operations of L-CCI and TWCI began to integrate. *Id.* ¶ 30.

In late December 2016, Charter Communications, LLC (CCL), another subsidiary of CCI, became the entity that employed Plaintiffs. (Defs.' Resp. to Pls.' Separate Statement of Material Fact ¶ 40, 44, ECF No. 83-3; Defs.' Statement of Admitted Facts ¶ 13, ECF No. 82-5 at 7).

In her deposition, Plaintiff Sansone provided the following information regarding her employment after December of 2016:

> Q   And after the transition from TWC Administration to Charter Communications, LLC, you still worked out of the same location?
> A   Yes.
> Q   Your salary stayed the same?
> A   My base salary, yes.
> Q   You kept the same physical office that you worked out of?
> A   Yes.
> Q   Kept the same insurance?
> A   The insurance changed, the plan changed, yes.

Q      Right. You had continuous -- I guess you had continuous insurance?
A      Yes.
Q      You never had to go on COBRA?
A      No.
Q      And your -- you continued to get your paycheck every two weeks?
A      Base salary, yes.
Q      There was never a time where you went without a paycheck as a result of the move from Time Warner Cable Administration to Charter Communications, LLC, was there?
A      Without base salary, no. There was an extensive delay on commission payouts during the transition of the plan.
Q      And I'm just asking right now about whether there was ever a time you went without a paycheck.
A      No.

(Sansone Dep., ECF No. 71-3 at 20–21).

In his deposition, Plaintiff Orduno provided the following information regarding his employment before and after December of 2016:

Q. . . . [A]round December of 2013 you moved to an account manager two position, is that correct?
A. Yes.
Q. All right. All right. The account manager two position, what were your job duties?
A. Sales.
Q. Sales of what?
A. Of our products and services to a hospitality group.
Q. All right. What give me some examples of what kind of products you were selling.
A. Internet, phone, data, video.
. . . .
Q. -- and then you moved, your next position was a strategic account manager of hospitality that you moved to at the end of the fiscal year 2016, correct?
A. Yes.
Q. Okay. What were your job duties as a strategic account manager in hospitality?
A. The same exact duties as an account manager two.
Q. All right. When you were an account manager two, what office did you work out of?
A. Indio, California.
. . . .

Q. Okay. And when you became the strategic account manager of hospitality, where was your office?

A. Same location, Indio, California.

Q. All right. And then physically within the building did your office change?

A. Cubicle, same cubicle.

Q. Okay. And when you were -- became the strategic account manager of hospitality, who did you sell those -- those products to?

A. Same customers that are within my area.

Q. Did you have, like, a list of customers that you sell to routinely?

A. Yes.

Q. And in the list of customers that you had as an account manager two, was that essentially the same list you had when you moved over to a strategic account manager position?

A. Yes.

(Orduno Dep., ECF No. 71-3 at 89–91).

A January 12, 2017 letter addressed to Plaintiff Orduno states that his "base salary compensation was recently reviewed and this statement describes your upcoming adjustment." (ECF No. 71-3 at 159). The letter shows that Plaintiff Orduno's 2016 title was "Account Commercial Mgr 2" and his 2016 salary was $72,621. Plaintiff Orduno's 2017 title was "SAM - Strategic AM Hospitality" and his 2017 salary was $66,771. In his deposition, Plaintiff Orduno stated the following regarding the letter:

Q. And you chose to continue working after receiving notification of that salary change, correct?

A. Yes.

Q. If you had wanted to, you could have quit, correct?

A. Sure. Everyone has that choice.

Q. And so you chose to continue working with knowledge that your salary was going to be lower, correct?

A. Correct.

(Orduno Dep., ECF No. 71-3 at 123). Defendants provide documents described as "pay advices detailing payments made to Orduno." (Zimmerman Decl. ¶ 11, ECF No. 83-9). The documents cover all dates between December 25, 2015 and June 1, 2017. (Ex. A to Zimmerman Decl., ECF No. 83-9 at 6–60). Each document contains Orduno's name and address and shows that Orduno received a "net pay distribution." *Id.* The documents show

payment by TWCA until December 15, 2016, and payment by CCL starting December 16, 2016.  *Id.* at 43, 45.[2]

In her deposition, Plaintiff Sansone was asked if she ever received any termination paperwork from Time Warner Cable.  (Sansone Dep., ECF No. 71-3 at 22).  Plaintiff Sansone replied, "No."  *Id.*  In his deposition, Plaintiff Orduno was asked whether he applied for the job of strategic account manager before he assumed the position at the end of 2016.  (Orduno Decl., ECF No. 82-5 at 274).  Plaintiff Orduno replied, "I don't recall applying for that one."  *Id.*  Plaintiff Orduno was then asked if he had "to do any sort of interviews to get that job?"  *Id.*  Plaintiff Orduno replied, "No."  *Id.*

Plaintiff Orduno used twenty-four hours of vacation time in the first pay period of employment with CCL.  (Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 46, ECF No. 82-2).  Plaintiff Sansone used thirty-two hours of vacation in the first month of employment with CCL.  *Id.* ¶ 47.  Plaintiff Orduno ". . . was paid for vacation hours taken at the rate of $69.52 per vacation hour" during 2016.  (Defs.' Resp. to Pls.' Separate Statement of Undisputed Material Facts ¶ 10, ECF No. 83-3).  In support of the assertion that Plaintiffs Orduno's rate of pay for vacation hours decreased, Plaintiffs provide the deposition of Beth Biggs, who is employed by Charter Communications as the Group Vice President, Benefits & Employee Services Center.  (Biggs Dep., Ex. E to Morello Decl., ECF No. 82-5).  Biggs was asked, ". . . is there an instance where Mr. Orduno was being paid vacation in 2017 by Charter Communications, LLC?"  *Id.* at 93.  Biggs responded, "Yes."  *Id.*  Biggs was then asked "And in that instance

---

[2] Plaintiffs raise evidentiary objections to the declarations of Beth Biggs, Daniel Bollinger, Tamara Zimmerman, and David Wilson, as well as to the LinkedIn profiles and instant message exchanges of Sansone and Orduno, that were submitted in support of Defendants' Motion for Summary Judgment and in opposition to Plaintiffs' Motion for Class Certification.  (ECF No. 82-4).  The Court has only considered the declarations of Tamara Zimmerman and David Wilson.  The Court overrules Plaintiffs' objections to the declaration of Tamara Zimmerman on the grounds that the testimony lacks foundation and is based on hearsay evidence.  Defendants have submitted into evidence the documents referred to in the declaration of Tamara Zimmerman.

what was the rate that Mr. Orduno was receiving for his vacation?" *Id.* at 93. Biggs responded, "The rate reference on 221 for vacation for Mr. Orduno is 32 -- roughly $32." *Id.* at 93. Biggs was then asked ". . . does it appear to you that Mr. Orduno was receiving for vacation time his base rate of pay in 2017?" *Id.* at 95. Biggs responded, "Yes." *Id.*

## III.  MOTION FOR SUMMARY JUDGMENT (ECF No. 71)

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A material fact is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The party moving for summary judgment "bears the burden of establishing the basis for its motion and identifying evidence that demonstrates the absence of a genuine issue of material fact." *Davis v. U.S.*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *Celotex*, 477 U.S. at 323); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). For "an issue on which the nonmoving party bears the burden of proof," the movant discharges its summary judgment burden by "pointing out . . . an absence of evidence to support the nonmoving party's case"—not by "*negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 325; *see also Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010). The burden shifts to the nonmovant to provide admissible evidence, beyond the pleadings, of specific facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Horphag Res. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007); *see also Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("[A] plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."). The

nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255. A nonmovant "defeat[s] summary judgment" if "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation omitted).

### B. California Labor Code Claims

Defendants contend that the Plaintiffs' claims under the California Labor Code fail as a matter of law because Plaintiffs cannot prove that a termination or discharge occurred in this case. Defendants contend that Plaintiffs continued working for the same entity in the same jobs and that no termination or discharge occurred based on the transaction that closed on May 18, 2016. Defendants contend that no termination or discharge occurred when Plaintiffs' employment was transferred from one subsidiary to another in late December 2016 because Plaintiffs continued working in the same jobs at the same location with no break in benefits, compensation, or seniority. Defendants assert that the purpose of California Labor Code § 227.3 is to ensure that employees are paid for accrued vacation that is unusable after employment is terminated. Defendants assert that Plaintiffs used vacation hours after the transfer to the affiliated entity.

Plaintiffs contend that a termination occurred as a result of the transaction that closed May 18, 2016 and caused the permanent end of Plaintiffs' employment with TWCA and the beginning of Plaintiffs' employment with a distinct company, Charter LLC. Plaintiffs contend that California Labor Code § 227.3 liability exists because § 227.3 relief is based on past service rather than events occurring after termination, even if Plaintiffs worked in identical jobs, maintained seniority, and received no termination paperwork. Plaintiffs contend that a termination occurred because TWCA ceased to operate in California and could not meet its wage obligations. Plaintiff Orduno contends that a termination occurred because he was paid vacation wages at the rate of $69.52 per vacation hour in 2016 by TWCA and $32.10 per vacation hour in 2017 by CCL.

California Labor Code § 227.3 provides:

> Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination. . . .

Cal. Lab. Code § 227.3. To prevail on claims brought pursuant to § 227.3, a plaintiff must prove that employment was terminated. *See, e.g.*, *Church v. Jamison*, 50 Cal.Rptr.3d 166, 171 (Ct. App. 2006) ("Thus, termination of employment is the event that converts the employer's obligation to allow an employee to take vacation from work into the monetary obligation to pay that employee for unused vested vacation time."); *Suastez v. Plastic Dress-Up Co.*, 647 P.2d 122, 128 (Cal. 1982) ("On termination of employment, therefore, the statute requires that an employee be paid in wages for a pro rata share of his vacation pay."). In the context of California Labor Code claims, California courts have stated that "the term 'termination' means the permanent cessation of the employment relationship." *Int'l Bhd. of Boilermakers v. NASSCO Holdings Inc.*, 226 Cal.Rptr.3d 206, 217 (Ct. App. 2017), *review denied* (Feb. 14, 2018), and that "the ordinary meaning of the phrase 'interruption or termination' of employment . . . requires a severance of the employee's underlying employment relationship," *Falkowski v. Imation Corp.*, 33 Cal.Rptr.3d 724, 731–32 (Ct. App. 2005).

California Labor Code § 201 provides, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a). California Labor Code § 203 provides, in part:

> If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

Cal. Lab. Code § 203(a). To prevail on claims brought pursuant to § 201 and § 203, a plaintiff must prove that employment was terminated, which may be satisfied by proving that plaintiff was discharged or quit. *Cf. McLean v. St. of Cal.*, 377 P.3d 796, 799–800 (Cal. 2016) ("The entitlement to prompt payment of final wages . . . extends to employees whose employment is terminated, whether by discharge or by quitting.").

The evidence in the record shows that Plaintiffs continued to work for TWCA after the transaction between TWCI and L-CCI closed on May 18, 2016. The record shows that Plaintiffs continued to perform the same jobs, at the same location, selling to the same customers after the transaction at issue closed on May 18, 2016. The evidence in the record shows that Plaintiffs performed the same duties, at the same location, selling to the same customers after their employment changed from the TWCA subsidiary to the CCL subsidiary in late December 2016. The record shows that Plaintiffs continuously received compensation and insurance coverage after May 18, 2016 and after late December 2016. The evidence in the record shows that Plaintiffs continued to receive credit for labor performed for TWCA after the May 18, 2016 transaction. The record shows that the vacation credits were transferred to CCL and were usable during employment with CCL after December 2016.

Defendants have come forward with evidence that shows Plaintiffs were not terminated or discharged within the meaning of the California Labor Code on either May 18, 2016 or in December 2016. *See Boilermakers*, 226 Cal. Rptr. 3d at 217 ("the term 'termination' means the permanent cessation of the employment relationship"); *see Falkowski*, 33 Cal. Rptr. 3d at 731–32 ( "the ordinary meaning of the phrase 'interruption or termination' of employment . . . requires a severance of the employee's underlying employment relationship"); *see also Elias v. Super. Ct.*, 2015 WL 1455910, at *7-8 (Cal.App.4th Mar. 30, 2015 (California Court concluded that no termination occurred where the employee "maintained her service time and seniority level;" her accrued vacation time and sick leave transferred with her;" the employee "dealt with the same

human resources personnel;" and the employee "was never required to apply, interview, . . . go through a selection process, . . . [nor] complete any new hire paperwork.").

The burden shifts to Plaintiffs to identify specific facts that show a genuine issue for trial. *See Anderson*, 477 U.S. at 256. Plaintiffs rely upon Defendants' Responses to Requests for Admissions in support of the assertion that a termination resulted from the transaction that closed on May 18, 2016. (Morello Decl., ECF No. 82-5). Plaintiffs requested that Defendant TWCA "admit that Charter LLC assumed YOUR obligations and liabilities to your employees as part of the TRANSACTION." (Ex. B to Morello Decl., ECF No. 82-5 at 20). Defendant TWCA responded,

> Defendant objects to this Request as vague and ambiguous because it does not define which specific "obligations and liabilities" Charter Communications, LLC allegedly assumed as part of the TRANSACTION. . . .
> Defendant objects to this Request as vague, ambiguous and unintelligible because Plaintiff defines "YOUR" to include "affiliates" and "related entities."
> Subject to and without waiving the foregoing objections and answering only on behalf of TWC Administration LLC, Defendant denies this Request.

*Id.* Plaintiffs requested that Defendant CCL "admit that YOU assumed TWC's obligations and liabilities to its employees as a part of the TRANSACTION." (Ex. C to Morello Decl., ECF No. 82-5 at 27). Defendant CCL responded,

> Defendant objects to this Request as vague and ambiguous because it does not define which specific "obligations and liabilities" CCL allegedly assumed as part of the
> TRANSACTION. . . .
> Defendant objects to this Request as vague, ambiguous and unintelligible because Plaintiff defines "YOU" to include "affiliates" and "related entities."
> Subject to and without waiving the foregoing objections and answering only on behalf of CCL, Defendant denies this Request.

*Id.* at 27–28.

Plaintiffs further rely upon the statement of admitted facts:

14

1. At all times, Charter Communications, LLC ("CCL") and TWC Administration LLC ("TWCA") have been and continue to be separate legal entities. . . .

13. In late December 2016, CCL became the employing entity for TWCA's former California workforce that transferred to CCL ("TWCA's Former California Workforce").

14. By the end of December 2016, TWCA did not have a California workforce . . . .

15. In late December 2016, CCL became responsible for the payroll of TWCA's Former California Workforce.

16. In late December 2016, TWCA's Former California Workforce began receiving paystubs identifying CCL as their employer. Before that time, TWCA's Former California Workforce received paystubs identifying TWCA as their employer. . . .

18. Vacation time accrual and calculation of vacation pay for TWCA's California workforce was subject to a vacation policy used by TWCA up until late December 2016.

19. On or around January 1, 2017, the vacation time policy used by CCL began governing vacation time accrual and calculation of vacation pay for TWCA's Former California Workforce. . . .

22. None of the Defendants treated TWCA's California workforce which transferred to CCL in late December 2016 as having been terminated from TWCA and, therefore, they did not seek or obtain mass consent to transfer their vacation time balances or otherwise, as a general matter, take any action to pay out those employees' vacation time balances. For the same reasons, none of the Defendants attempted to convey to TWCA's Former California Workforce any option to have their vacation paid out in its entirety by TWCA prior to the date they transferred to CCL in late December 2016.

*Id.*

To support the assertion that a termination occurred, Plaintiffs provide the declarations of Plaintiff Orduno and Plaintiff Sansone. (Sansone Decl. & Orduno Decl., Exs. F & G to Morello Decl., ECF No. 82-5). Plaintiffs state in their declarations:

As a result of transaction between TWC and Charter Inc. and the termination of my employment with TWCA, significant changes occurred with respect to my employment and that of my team and other former TWCA employees including:

• Our employment with TWCA ended;

• We became employed by [CCL];

• We ceased receiving wage statements from TWCA and began receiving wage statements from [CCL] that listed our employer as [CCL]; and
• We became subject to [CCL]'s and [CCI]'s policies and practices. . . .
In January 2017, [CCL] notified its California workforce of former TWCA employees that their vacation wages . . . would be paid at a rate calculated purely on base compensation. . . .

(Sansone Decl. ¶¶ 10–11 & Orduno Decl. ¶¶ 8, 10). Orduno states, "In 2017, when [CCL] stopped paying vacation wages at the [Annual Benefit Base Rate], the value of my accrued vacation bank dropped substantially. . . ." (Orduno Decl. ¶ 11). Sansone states that TWCA employees obtained access to Charter systems and received Charter branded email addresses after May of 2016. (Sansone Decl. ¶ 7). Sansone's declaration is supported by exhibits including communications received by TWCA employees that welcome them to the Charter team, explain the integration process, and respond to questions about "employment with Charter" and "becoming a Charter employee." (Exs. C, D to Sansone Decl., ECF No. 82-5).

In support of the assertion that Plaintiffs' employment with TWCA ended and their employment with CCL began, Plaintiffs provide the deposition of Beth Biggs. (Biggs Dep., Ex. E to Morello Decl., ECF No. 82-5). At her deposition, Biggs was asked, "Do you still have wage statements for California employees of TWCA for 2018 and 2019?" *Id.* at 64. Biggs responded, "They were not employees -- they were continuing employees that were formerly with Time Warner Cable. Time Warner Cable Administration did not have employees in 2017 and 2018." *Id.* Plaintiffs provide a certificate of surrender of the right to transact business in the state of California, filed with respect to TWCI on August 18, 2016. (Ex. B to Pls.' Request for Judicial Notice, ECF No. 82-1 at 86).[3]

---

[3] Plaintiffs request judicial notice of the certificate of surrender of the right to transact business with respect to TWCI, filed with the Secretary of State of California on August 18, 2016. Defendants do not oppose the request. The Court grants the request for judicial notice with respect to the certificate. *See Kearny Mesa Real Estate Holdings, LLC v. KTA Constr., Inc.*, No. 17CV207-WQH-MDD, 2017 WL 3537753, at *3 (S.D. Cal. Aug. 16, 2017) (taking judicial notice of a "true and correct copy of the Certificate of Registration issued by the California Secretary of State") (citing Fed. R. Evid. 201; *U.S. v.*

The evidence in the record shows that Plaintiffs stopped receiving wage statements from TWCA and began receiving wage statements from CCL in January 2017. The record shows that Plaintiffs became subject to CCL's and CCI's policies and practices in January 2017. In January 2017, CCL notified Plaintiffs that their vacation wages would be paid at a rate calculated purely on base compensation. The evidence in the record shows that Plaintiffs continued to perform the same jobs, the same duties, at the same location, selling to the same customers after the transaction at issue closed on May 18, 2016 and after the change from the TWCA subsidiary to the CCL subsidiary in December 2016. The record shows that Plaintiffs continuously received compensation and insurance coverage after May 18, 2016 and after December 2016. Plaintiffs continued to receive credit for labor performed for TWCA after the May 18, 2016 transaction. The vacation credits were transferred to CCL and were usable during employment with CCL after December 2016, subject to CCL policies. Plaintiff Orduno used twenty-four hours of vacation time in the first pay period of employment with CCL and Plaintiff Sansone used thirty-two hours of vacation in the first month of employment with CCL. Plaintiffs were not given any paperwork regarding termination or rehiring after either the May 18, 2016 transaction or the December of 2016 transfer to CCL.

---

*Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994)).

In addition, Plaintiffs request judicial notice of the proxy statement and attached merger agreement filed with the Securities and Exchange Commission on June 26, 2015. (Ex. A, ECF No. 82-1). Plaintiffs request judicial notice for the truth of the contents of the SEC filing as support for the substance of their claims. The Court cannot properly take judicial notice of the content of the SEC filing for this purpose. *See* ECF No. 27 at 4–5; *see also Aaron & Andrew, Inc. v. Sears Holdings Mgmt. Corp.*, No. CV 14-1196 SS, 2018 WL 1942373, at *7 (C.D. Cal. Mar. 26, 2018) (collecting cases) ("[T]he Court may not take judicial notice of the truth of such disclosures, including those in AMIN's Form 10-K and 8-K filings with the SEC, to find a disputed issue of fact."); *Pub. Storage v. Sprint Corp.*, 2015 WL 1057923, at *16 (C.D. Cal. Mar. 9, 2015) ("To support their claim [on summary judgment] that 'it is indisputable' that both mergers were reverse triangular mergers . . . Defendants want the Court to take judicial notice of the merger-related 'facts' stated in the SEC filings, and conclude from those facts that the Sprint–Nextel and SoftBank mergers were reverse triangular mergers. That the Court cannot do."). The request for judicial notice is denied with respect to the SEC filing.

The court concludes that Plaintiffs have not come forward with evidence to show that a termination occurred. The evidence in the record shows that Plaintiffs did not experience a "permanent cessation of the employment relationship," *see Boilermakers*, 226 Cal. Rptr. 3d at 217, or "a severance of the employee's underlying employment relationship," *see Falkowski*, 33 Cal. Rptr. 3d at 731–32. *Compare Elias*, 2015 WL at *7-8 (concluding that no termination occurred because the employee "maintained her service time and seniority level;" "her accrued vacation time and sick leave transferred with her;" she "dealt with the same human resources personnel;" and she "was never required to apply, interview, . . . go through a selection process, . . . [nor] complete any new hire paperwork. . ."), *with Chapin v. Fairchild Camera and Instrument Corp.*, 31 Cal.App.3d 192 (1973) (concluding that a termination did occur because "the Employees were hired . . . under substantially different terms," which "not only did not provide severance pay of the same duration . . . , but also did not undertake to discharge [the] obligation of severance pay to the Employees").

California Labor Code § 227.3 provides: ". . . whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate . . . ." Cal. Lab. Code § 227.3. The statute requires that a termination of employment must occur in order for a terminated employee's vested vacation to be paid as wages. *See id*. The Court concludes that Plaintiffs have not presented evidence to show that a termination occurred in this case. While Plaintiffs became subject to CCL's and CCI's policies and practices in January 2017, the Court concludes that this change in employment policies and practices does not constitute a termination under the facts of this case. The evidence in the record "supports the existence of a single, continuous [at-will] employment relationship." *Elias*, 2015 WL at *8. Summary judgment is appropriate in favor of Defendants as to the California Labor Code causes of action.

**C. Breach of Contract Claims**

Defendants contend that they are entitled to summary judgment on the breach of contract claims based on Plaintiff Orduno's base pay because Plaintiff Orduno was an at-will employee at all times, and Defendant CCL retained the right to reduce his compensation. Defendants contend that Plaintiff Orduno bases these claims on an email sent by TWC Executive Vice President, Peter Stern, over one year before the Transactions closed. Defendants contend that that email did not constitute a valid offer because 1) there is no evidence that Peter Stern was authorized to bind Charter or make an offer on its behalf, 2) the email included an explicit disclaimer stating that it was for informational purposes only, 3) the email did not purport to alter Plaintiff Orduno's at-will employment, and 4) the email fails to comply with the statute of frauds because it does not constitute a sufficient writing and was not signed. Plaintiffs contend that the breach of contract claim based on Plaintiff Orduno's base pay survives because Defendants promised not to reduce base pay for twelve months for employees who remained through the transaction, and Plaintiff Orduno continued his employment through the transaction close.

"Under a breach of contract theory, the plaintiff must demonstrate a contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and damage to the plaintiff." *Amelco Elec. v. City of Thousand Oaks*, 38 P.3d 1120, 1129 (Cal. 2002). In *DiGiacinto*, the California Court of Appeal stated that "an employer of an at-will employee can unilaterally change the compensation agreement without being in breach of the employment agreement." *DiGiacinto v. Ameriko-Omserv Corp.*, 69 Cal.Rptr.2d 300, 304 (Ct. App. 1997). The plaintiff in *DiGiacinto* was an at-will employee who was notified orally and in writing on January 30, 1995 that his rate of pay would be reduced, effective February 5, 1995. *Id.* at 301. The plaintiff "asked that his wages not be reduced," "refused to sign the January 30, 1995 letter," and "continued in defendant's employ after February 5, 1995." The court stated that "the evidence in this case is undisputed and permits only the conclusion that DiGiacinto accepted the terms set out in the January 30, 1995, letter" and that "the January 30, 1995 letter must be considered to constitute the employer's notice

of termination of the old at-will employment contract and an offer of a unilateral contract under new terms." *Id.* at 306.

In *McCaskey v. Cal. St. Auto. Ass'n*, the compensation plan provided that failure to meet sales quotas was grounds for termination and had reduced quotas for senior employees. *McCaskey v. Cal. St. Auto. Ass'n*, 118 Cal.Rptr.3d 34, 38 (Ct. App. 2010). The defendant modified the compensation plan to eliminate the reduced quotas for senior employees. The plaintiffs refused to sign the modified compensation plan and continued to work for the defendant. The court stated that "the rule" in *DiGiacinto*, regarding the effect of an employee continuing to work after compensation is modified, "depends on the at-will character of the employment." *Id.* at 53. The court stated that "if the employer was not free to terminate the old contract, the worker cannot bind himself to its abrogation merely by continuing to work, at least where he makes explicit his lack of assent to the new terms." *Id.* The court "read[] the [quota] reductions as an exception to the general rule of at-will employment" provided by the agreement. *Id.* at 52. The court stated that "the contract may permit [the defendant] to discharge plaintiffs for no reason, or even for a bad reason, but it does not permit their discharge for the reason that they had invoked, or insisted on the right to invoke, the [quota] reductions." *Id.* at 53. The court stated that "Defendants remained free to revise the plan as a whole. For that matter, so far as plaintiffs were concerned, defendants were free to drop the [quota] reductions as they might otherwise apply in the future to employees who had not yet qualified for them." *Id.*

It is undisputed that Peter Stern's email included the following content:

> "*Please note that your receipt of this communication does not mean that you are eligible for all of the benefits discussed in this document. This communication is for informational purposes only and in all instances, the terms and conditions of the applicable plan and agreements govern. Please consult the applicable documents for specific eligibility and participation requirements.*"

(Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 17, ECF No. 82-2). Peter Stern's email explicitly and unambiguously disclaimed that Plaintiffs may not be

eligible for all benefits discussed. *See Scheller v. Interstate Realty Mgmt.,* 2014 WL 2918879, at *7 (E.D. Cal. June 24, 2014) (concluding that the plaintiff's breach of contract claim lacked merit "because the handbook expressly and unambiguously provide[d], in bold print, that it d[id] not confer contractual rights of any kind: This Handbook is a general guideline voluntarily adopted by the Company for informational purposes only. It is not intended to and does not create an express or implied contract of employment or any other contractual rights, obligations or liabilities. . . ."); *Yellowstone Poky, LLC v. First Pocatello Associates, L.P.*, 2018 WL 2077725, at *9 n. 4 (D. Idaho Feb. 27, 2018) (concluding that a disclaimer stating ". . . for information purposes only" "indicates that [the documents in question] may be subject to reasonable dispute . . ."); *Salazar v. Monaco Enterprises, Inc.*, 2014 WL 1976601, at *9 (E.D. Wash. May 15, 2014) (concluding that there is no "breach of a promise" after "[h]aving not found, as a matter of law, that [the employee] justifiably relied on any promises of specific treatment in specific situations due to what the Court finds as effective disclaimers throughout the handbook. . .").

Plaintiffs have not come forward with evidence to show that a valid contract was formed. The 2015 TWCA Employee Handbook stated:

> "[o]nly those individuals authorized by the Chairman of the Board and Chief Executive Officer, Vice Chairman, or President of the Company have any authority to . . . make any agreement contrary" to the at-will policy and any changes must be made, in writing, *by the CEO, Vice Chairman, President, or General Counsel*."

(Pls.' Resp. to Defs.' Separate Statement of Undisputed Material Facts ¶ 9, ECF No. 82-2). The CCL Employee Handbook stated:

> "all employees are 'at-will' and that '[n]o supervisor, manager, or representative of Charter, other than the CEO of Charter or the Compensation Committee of the Board, has the authority to enter into any agreement with any employee, or prospective employee, for any specified period.' The employment-at-will policy further provides that 'any employment agreement entered into shall not be enforceable unless it is in writing and is signed by [the employee] and either the CEO or a member of the Compensation Committee of the Board.'"

At the time the email was sent, Peter Stern was serving as Executive Vice President of TWC. Plaintiffs have not come forward with evidence to show that Peter Stern had authority to revise at-will status and bind Charter to an agreement not to reduce base pay inconsistent with at-will employment status because he did not occupy the position of Chairman of the Board, Chief Executive Officer, Vice Chairman, or President of TWCA. *See, e.g., Smith v. H.F.D. No. 55, Inc.*, 2016 WL 881134, at *1 (E.D. Cal. Mar. 8, 2016) (concluding that arbitration could not be compelled even though the Executive Vice President of Human Resources signed the agreement because the employee's job application explicitly vested only the Director of Human Resources with ". . . the authority to enter into any agreement for employment for any specified period of time or to make any change to any policy, procedure, benefit, or other term or condition of employment. . . ."). The Court concludes that Defendants are entitled to summary judgment on the claim for breach of contract based on reduced base salary.

Defendants contend that they are entitled to summary judgment on the breach of contract claims based on Plaintiffs' commissions because Plaintiffs provide no evidence that Plaintiffs were promised a certain amount of commissions. Defendants assert that Defendant CCL consistently interpreted commission plans to reduce coax sale commissions by 50%, including one-time-event commissions, and did not retroactively reduce commissions. Plaintiffs contend that the breach of contract claim based on Plaintiffs' commissions survives because CCL described commissions for "One-Time Events" as "10% of the [monthly recurring revenue]/[non-recurring charges]" without distinguishing between coax and fiber sales. Plaintiffs contend that when Charter LLC paid Plaintiff Orduno commissions for "One-Time Event" sales, it retroactively added a condition that distinguished between Coax and Fiber sales. Plaintiffs contend that Charter LLC reduced commissions on Coax sales by 50% and, accordingly, paid Plaintiff Orduno only 5% on "One-Time Event" sales attributable to Coax products.

Defendants provide the declaration of David Wilson, who is "employed by Charter Communications as General Vice President, Sales Operations." (Wilson Decl. ¶ 2, ECF No. 71-5).[4] Wilson states in his declaration:

> Prior to fiscal year 2017 (i.e. , before December 19, 2016), Baldemar Orduno's and Jennifer Sansone's commissions were governed by their respective [TWCA] commission plans, which did not materially distinguish between sales for coaxial internet and fiber internet except as to the timing of payments for such sales. . . .
>
> The fiscal year 2017 commission plans governing Sansone's and Orduno's commissions were consistently interpreted from their roll-out with regard to their treatment of sales of complex coax products. That is, [CCL] interpreted and applied those plans from the beginning of their effective dates such that sales of complex coax products retired quota at a reduced 50% rate and, under Orduno's plan, generated commissions at a reduced 50% rate.

*Id.* ¶¶ 3, 9. Defendants provide excerpts from the deposition of Plaintiff Orduno:

> Q. Did Charter LLC retroactively reduce the commissions . . . in violation of the terms of the commission plans? . . .
>
> THE WITNESS: Yes, they did. They didn't pay me my 10 percent on my one-time event on coax products.
>
> Q. Okay. How did they retroactively reduce your commissions? . . .
>
> THE WITNESS: It says on my comp plan it's getting paid out at 10 percent, and it was not paid at 10 percent. . . .
>
> Q. . . . [W]as there a particular sale in question where they told you you are going to receive X amount of dollars and then they reduced that amount when it was actually paid? . . .
>
> THE WITNESS: Yes. . . . Coachella.
>
> Q. Okay. When was the Coachella -- this was a one-time event sale?
>
> A. A one-time event sale that should have been paid at 10 percent on the coax based on the comp plan, and it was not paid at 10 percent. . . .
>
> Q. How do you know what amount you're going to get paid out on a particular sale? . . .
>
> THE WITNESS: Based on my comp plan. So if I sell a hundred thousand dollars and it's 10 percent, I get $10,000. . . .
>
> Q. I mean, for a particular sale, can you identify how much commission you made off of that particular sale? Do you get notified?

---

[4] The Court overrules Plaintiffs' objections to the declaration of David Wilson on the grounds that the testimony lacks foundation and is based on hearsay evidence.

A. Yes, you do. They give you a commission report. . . .

Q. Do you have any sort of document specific to that Coachella sale that told you you would receive a higher amount than you actually received?

A. You have it in front of you. It's right here. 10 percent.

Q. Does that document mention Coachella? . . .

THE WITNESS: Coachella is a one-time event. It falls under the one-time events. . . .

Q. . . . [T]here was a commission report that was specific to this Coachella one-time event sale, correct?

A. There's a commission report that's given to us every month, what those commissions that are earned during that time frame, and Coachella -- some of the Coachella sales were part of that one, yes.

Q. Okay. And I'm talking specifically about the March 2017 Coachella one-time event sale that you were referring to before.

A. Okay.

Q. There was a commission report that told you what your expected commissions were going to be from that sale . . . correct? . . .

THE WITNESS: . . . [T]he contracts were signed in March, and that commission came about in, like, May -- May or June of '17. . . .

Q. Okay. And do you recall how much, even roundabout how much it said you would receive on that sale?

A. I don't recall. I just know that it wasn't at the 10 percent. . . .

Q. . . . The amount that was listed on that commission report, right or wrong, that amount is what you ended up getting paid, correct?

A. Correct.

(Orduno Dep. ECF No. 71-3 at 143–144; Orduno Dep. ECF No. 82-5 at 301–306).

Defendants provide a March 27, 2017 email from Kristine Lawrence to Plaintiff Orduno, responding to Plaintiff Orduno's concerns that he was not properly paid for his commissions:

> According to both Sales Operations and our Commission compensation authors, the correct interpretation of this document is that COAX onetime events would be calculated at 50% of the 10%. They refe[r]ed me to this section of the comp plan; the highlighted section explains the Sales Crediting (quota retirement) logic. The One Time Event language builds off the crediting logic.
> PLAN COMPONENTS, PERFORMANCE MEASURES AND MECHANICS
> Plan Components

Total compensation is a mix of base salary and variable compensation. Commission Plan components included in the Plan are as follows:

1. Monthly Commission— the Participant may be eligible for a monthly commission based on the prior fiscal month sold and installed monthly recurring revenue (MRR) that can be verified in the CRM and/or Charter billing System.

Booked Sales MRR

a. An advance payment portion of the commissions will be paid under this Plan for Sales Complete for all fiber opportunities. Eligible Customer Contracts must be signed, ratified, and are deemed valid contracts for construction and installation for products and services.

b. Commissions will be calculated by applying a Payout Rate from the "Net Written Pay Table" to the Sales Complete MRR (including amortized NRC/OTC, defined below) based on Achievement to Goal.

c. Complex Coax, i.e. Ethernet/PRI/SIP over Coax (and other Coax if included on the rate table) Booked MRR will retire quota at 50% of the Booked Net New Incremental MRR and will only be paid at Billed.

d. Example: Sales Complete MRR for a month with a Net-Written quota attainment of 100% receives a Pay Factor of 0.8. Booked MRR x $0.80 Commissions Advance payment

ONE-TIME EVENT COMMISSIONS

A one-time event is defined as temporary services provided to a customer for a limited period of time. A limited period of time under this compensation plan is defined as less than 90 days and includes events and temporary increases in service. Examples of One-time events are Rodeos, Golf Tournaments, Etc. Spectrum Enterprise can customize a service package for customers on a per event basis or billed in increments. One-time event fees will retire quota at 10% of the MRR/NRC and will receive commissions at 10% of the MRR/NRC.

(Ex. to Orduno Dep., ECF No. 71-3 at 157).

The record shows that CCL consistently paid, and did not reduce, the commissions. The record shows that Plaintiff Orduno attended a meeting prior to the roll-out of the new commission plans where senior leadership stated that employees should focus on selling fiber over coax. Defs.' Reply to Pls.' Resp. to Defs.' Separate Statement of Material Fact ¶ 55, ECF No. 83-2. The fiscal 2017 commission plan for Plaintiffs explicitly promoted fiber sales over coax sales, stating: "The purpose of the [plan] is to provide incentive compensation for selling new and upgrade *fiber products and services* to commercial

clients. The plan is intended to *drive fiber revenue* growth . . . ." *Id.* ¶ 59. Defendants have carried their burden to show they are entitled to summary judgment with respect to the breach of contract claim based on commissions. *See Celotex*, 477 U.S. at 323, 325; *Sluimer*, 606 F.3d at 586.

The burden shifts to Plaintiffs to identify specific facts that show a genuine issue for trial. *See Anderson*, 477 U.S. at 256. Plaintiffs contend that summary judgment is improper because the compensation plan did not distinguish between fiber and coax sale commissions and CCL retroactively added a distinction that caused a reduction in Plaintiffs' commissions. Plaintiffs provide the following excerpts from the deposition of Plaintiff Orduno:

> THE WITNESS: One-time events are supposed to be paid out at 10 percent of the MRR, which is the monthly recurring revenue, and the NRC, which is the installation charge, and that was not the case. I got hit on the coax portion. So it's -- in the past, if all the other comp plans are read the same, then I would get paid 10 percent of the entire sale on both coax and fiber, and with this one here, it's still read the same, and they docked me 50 percent on the coax. . . .
> Q. And when you said "in the past," those were plans under Time Warner Cable, correct?
> A. Prior to this one, correct.
> Q. So this plan was issued, according to you, by a new employer, correct?
> A. Correct. . . .
> Q. Where is the language in the commission plan . . . that you think Charter is not interpreting properly?
> A. If you turn to page 10 . . . .
> Q. The One-Time Event Commissions section?
> A. Correct. . . . It says it right there, "One-time event fees will retire quota at 10 percent of the MRR and NRC and will receive commissions at 10 percent of MRR and NRC." One-time events are identified as services less than 90 days and includes events and temporary increases in services. Examples, rodeos, golf tournaments, et cetera.
> Q. . . . [T]here is language in the commission plan that says complex coax will be paid out at 50 percent, correct? . . .
> THE WITNESS: Yes.
> Q. But it's your contention that that language does not apply to one-time events?
> A. Not here.

Q. It's your contention because it's not specifically listed in this section, that the 50 percent reduction does not apply? . . . You said that that 50 percent language with regard to complex coax, you've said it doesn't appear in the One-Time Event Commissions section on page 10 of the plan, correct?

A. That's correct. . . .

Q. So on page 7 of the plan, under 1 c. where it says, "Complex coax booked MRR will retire quota at 50 percent of the booked net new incremental MRR and will only be paid at billed," do you see that?

A. Yes.

Q. So it's your contention that that 50 percent reduction would not apply to one-time event sales?

A. No.

Q. And same way with the billed MRR, which is in the next section under c., it has the same language except it says it will be paid for all billed verified MRR at 50 percent rate?

A. Correct.

(Orduno Dep. ECF No. 82-5 at 296–297, 309–311).

In this case, the alleged breach of contract is that CCL "unilaterally reduced the commissions to be paid, and credit to be applied to sales for use in determining sales-related bonuses, for Complex Coax products in violation of the terms of the Commission Plans." (ECF No. 19 ¶ 75). The evidence in the record shows that CCL consistently interpreted the commission plan and paid commissions in accordance with that interpretation. Plaintiffs have not come forward with evidence to show that CCL promised to pay commissions other than according to the language of the CCL compensation plan. Plaintiffs have not come forward with evidence to show that CCL changed the interpretation of its compensation plan. Plaintiffs' evidence does not create a genuine issue of fact as to whether a breach of the commission plan occurred. Summary judgment is appropriate in favor of Defendants as to the breach of contract causes of action.

### D. Unfair Competition, California Business and Professions Code § 17200

Defendants contend that Plaintiffs' unfair competition claim fails because it is derivative of Plaintiffs' other failed claims. Plaintiffs do not address the unfair competition claim in the opposition to summary judgment.

California's Unfair Competition Law provides civil remedies for "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The statute's "unlawful" prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999) (internal quotations and citation omitted). In this case, Plaintiffs premise the unfair competition claim on violations of California Labor Code § 227.3. The Court has concluded that Defendants are entitled to summary judgment on the Plaintiffs' claims other than the unfair competition claim; accordingly, Defendants are entitled to summary judgment on the unfair competition claim.

**E. Rule 56(d) Request**

Plaintiffs contend that summary judgment is improper at this stage in the litigation because Plaintiffs have not had an adequate opportunity to conduct merits discovery. Defendants contend that Plaintiffs fail to satisfy the requirements of Rule 56(d) because Plaintiffs do not specifically identify the discovery sought or explain why the discovery is necessary to oppose summary judgment.

Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The Court of Appeals stated in *Stevens v. Corelogic, Inc.*:

> Rule 56(d) provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence. . . . A party seeking additional discovery under Rule 56(d) must explain what further discovery would reveal that is essential to justify its opposition to the motion for summary judgment. . . .
>
> This showing cannot, of course, predict with accuracy precisely what further discovery will reveal . . . . But for purposes of a Rule 56(d) request, the evidence sought must be more than the object of pure speculation. . . . A party seeking to delay summary judgment for further discovery must state what

other specific evidence it hopes to discover and the relevance of that evidence to its claims. . . . In particular, the requesting party must show that: (1) it has set forth in affidavit form *the specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.

899 F.3d 666, 678 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1222 (2019) (quotations, citations, and alterations omitted).

In this case, Plaintiffs provide the declaration of Justin Morello, Plaintiffs' counsel. Morello states in his declaration that the parties agreed to delay certain merits discovery until after the class certification stage. Morello states that Plaintiffs seek additional discovery regarding "including the relatedness of the entities, the underlying facts relating to the contribution and distribution of TWCA's assets and obligations, whether Defendants adhered to proper corporate formalities, what benefits Defendants derive from their current corporate structure, what benefits Defendants derived from not paying vacation banks at termination from TWCA, and additional merits based discovery concerning the corporate structures of [CCI], [TWCA] and [CCL] pre- and post- transactions." (ECF No. 82-6 at 3). Morello states that Plaintiffs seek additional discovery related to "who devised the 'transfer,'" of accrued vacation balances, "what their rationale was, what efforts of compliance were made, and how the 'transfer' was functionally completed"; and related to Peter Stern's authorization and Defendants' state of mind when guaranteeing base bay for one year. *Id.* at 4. Morello states that Plaintiffs seek "discovery regarding evidence submitted for the first time with Defendants Motion for Summary Judgment, including depositions of declarants not previously identified . . . because such evidence is solely and exclusively in the possession or control of Defendants." *Id.* at 6.

The Court concludes that Plaintiffs fail to identify specific facts and explain the legal significance of the facts sought. *See Corelogic, Inc.,* 899 F.3d at 678–79 (affirming that "a bare assertion that the 'documents are likely to be directly relevant to . . . the mental state requirement of "knowing,"' was a "request at [a] level of generality . . . insufficient for Rule 56(d) purposes"). "[T]he information sought would not illuminate the determinative

inquir[ies]" in this case, whether a permanent cessation of the employment relationship occurred and whether Plaintiffs were at-will employees. *See id.* at 679. The Court denies any requests related to discovery that Plaintiffs have not "set forth in affidavit form." *See id.* at 678. The Court denies Plaintiffs' Rule 56(d) requests.

## IV. MOTION TO SEAL (ECF No. 72)

Defendants request that the Court seal exhibits that "contain confidential and sensitive information regarding Charter Communication, LLC's business and compensation plans." (ECF No. 72 at 3). Defendants state that the exhibits "will be redacted in their entirety in the version filed electronically concurrently with Defendants' Motion for Class Certification." *Id.*

"[C]ourts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (quoting *Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597 (1978)). The Court of Appeals stated in *Chrysler* that courts "start with a strong presumption in favor of access to court records," which is "based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *Id.* (quotations omitted). "[A] party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the 'compelling reasons' standard." *Id.* (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). *Chrysler* provides,

> Under this stringent standard, a court may seal records only when it finds "a compelling reason and articulates the factual basis for its ruling, without relying on hypothesis or conjecture." . . . The court must then "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." . . . What constitutes a "compelling reason" is "best left to the sound discretion of the trial court." . . . Examples include when a court record might be used to "gratify private spite or promote public scandal," to circulate "libelous" statements, or "as sources of business information that might harm a litigant's competitive standing."

*Id.* at 1096–97 (first quoting *Kamakana*, 447 F.3d at 1178–79, then quoting *Nixon*, 435 U.S. at 598–99).

"[T]he resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the public's understanding of the judicial process and of significant public events." *Kamakana*, 447 F.3d at 1179 (quotation omitted). "[C]onclusory statements about the content of the documents—that they are confidential and that, in general, their production would, amongst other things, hinder [the defendant's] future operations . . . do not rise to the level of "compelling reasons" sufficiently specific to bar the public access to the documents." *Id.* at 1182.

In this case, Defendants request that the Court seal documents that support Defendants' Motion for Summary Judgment, a matter "at the heart of the interest in ensuring the public's understanding of the judicial process and of significant public events." *See Kamakana*, 447 F.3d at 1179. Defendants assert that the documents "contain confidential and sensitive information regarding Charter Communication, LLC's business and compensation plans." (ECF No. 72 at 3). The Court finds that Defendants fail to overcome the strong presumption in favor of public access with respect to the information regarding business and compensation plans. *Compare Digital Reg of Texas, LLC v. Adobe Sys. Inc.*, No. C 12-1971 CW, 2013 WL 4049686, at *2 (N.D. Cal. Aug. 8, 2013) (denying motion to seal supported a declaration that "only describes the subject matter of the exhibits and makes conclusory statements that it considers the material to be confidential or sensitive"; "[f]or example, it states that one exhibit is "a confidential business record with sensitive financial information that the parties have agreed to maintain as confidential" and that another "includes, inter alia, confidential business strategies and financial information"), *with In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2013 WL 163779, at *4 (N.D. Cal. Jan. 15, 2013) ("The declarations filed by representatives from each Defendant also explain why each individual Defendant seeks to maintain the confidentiality of specific information contained in particular exhibits and

portions of the motion under seal, as well as the harm that would flow to the company from public disclosure.").

The Motion to File Documents Under Seal filed by Defendants (ECF No. 72) is denied. The documents (ECF No. 73) shall remain lodged at this stage in the proceedings. Defendants shall file an Amended Motion to file documents under seal within thirty (30) days of the date of this Order; otherwise Defendants shall file the documents on the record within seven (7) days of the date of this Order.

## V. CONCLUSION

IT IS HEREBY ORDERED that Motion for Summary Judgment filed by Defendants Charter Communications, Inc.; Charter Communications, LLC; and TWC Administration LLC is granted. (ECF No. 71).

IT IS FURTHER ORDERED that the Motion to Certify Class (ECF No. 61) filed by Plaintiffs Jennifer M. Sansone and Baldemar Orduno, Jr. is denied as moot.

IT IS FURTHER ORDERED that the Motion to File Documents Under Seal (ECF No. 68) filed by Defendants Charter Communications, Inc.; Charter Communications, LLC; and TWC Administration LLC is denied.

IT IS FURTHER ORDERED that the Motion to File Documents Under Seal filed by Defendants (ECF No. 72) is denied.

The Clerk of the Court shall enter judgment for Defendants and against Plaintiffs.

Dated:  September 18, 2019

*William Q. Hayes*
Hon. William Q. Hayes
United States District Court